UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN NOEL FAITH,<br><br>             Petitioner,<br><br>    v.<br><br>KEN CLARK, et al.,<br><br>             Respondent. | 1:08-CV-1423 AWI JMD HC<br><br>FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>OBJECTIONS DUE WITHIN THIRTY (30) DAYS |

Stevin Noel Faith (hereinafter "Petitioner") is a prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation serving a fifteen year to life sentence pursuant to a 2006 conviction for second-degree murder which occurred in December of 1980. In 1981, Petitioner was convicted of first degree murder, but in 2006, this Court granted Petitioner's initial habeas petition and vacated the conviction. See Faith v. Hamlet, 00-cv-00493 JKS GGH. Subsequent retrial of the original charges resulted in Petitioner's 2006 conviction and current sentence.

On April 26, 2007, the California Board of Parole Hearings ("Board") conducted a hearing and denied Petitioner parole. See Board Transcript ("Transcript") at 128-35.[1] The Board issued a two-year denial of parole. See Petition at 23. On April 28, 2008, the Butte County Superior Court denied Petitioner's state habeas petition. See Respondent ("Resp't") Answer Exhibit 2. The California Court of Appeal and the California Supreme Court issued summary denials of Petitioner's

---

[1] The transcript of the parole hearing is listed as Exhibit 1 of Respondent's Answer.

1 claim.  On August 28, 2008, Petitioner filed the instant federal petition for writ of habeas corpus

2 challenging the Board's denial of parole.  Petitioner claims the Board violated his due process rights

3 because there was not "some evidence" in the record to show that he is currently dangerous and there

4 was no showing of a rational nexus between the grounds stated by the Board and a conclusion of

5 dangerousness.  On January 27, 2009, Respondent filed an answer to the petition.  See Doc. No. 17.

6 On April 27, 2010, Petitioner filed a reply.  See Doc. No. 22.[2]

## FACTUAL BACKGROUND

The Board summarized the facts as follows:[3]

> [On] December 12th, 1908, . . . Stevin Faith and his common-law spouse, Julie Marrero were in the premises of Noble's Bar located in downtown Gridley along with their infant child.  It appears that Miss Marrero may have had words with a female bar patron, Deborah Cox, possibly, and Mr. Faith, . . . took her and the child home.  Shortly thereafter, Mr. Faith returned to the tavern.  Deborah Cox, whom he had reportedly been seen with the night before, had left the establishment.  Mr. Faith consumed some beer and likewise departed, proceeding to another nearby tavern, The Buttes.  It appeared that Faith reestablished contact with Miss Cox at The Buttes, and the two were seen dancing and drinking together.  Sometime around 1:00 a.m., Mr. Faith left the tavern followed by Miss Cox on an approximately 30 minute interval.  At approximately 9:00 a.m., December 13th, Mr. Faith appeared at the hospital room of one Debbie Expolious . . ., [a] Gridley resident.  She reports that he asked if he could go to her house and sleep for a while insomuch as he and his wife for [sic] fighting and they did not get any sleep in the previous night.  She informed him that he could, but she did not have a key and suggested he go somewhere more convenient.  He, however, reportedly insisted, and she finally told him to go ahead, stating he could find an unlocked window.  Mr. Faith then left the hospital room but returned a few minutes later, stating that there was a dead woman in her bed.  He also informed Miss Expolious that he had never seen the woman and went into great detail about touching the body and commenting that his fingerprints would be all over it.  Miss Expolious immediately contacted the Police Department, and shortly thereafter, the officers arrived at the scene.  Upon checking the exterior of the building, they found an unlocked bedroom window, and upon opening it, they pushed the curtains aside.  They observed a nude body of a woman lying across a bed under the window.  They were then let into the residence by Miss Expolious's father and made a closer examination of the body.  According to the investigating officer, there's a quote from the officer, '[s]he was completely nude with her face down on her right arm under her body. Her left arm was laying outward from the bed.  Her head was laying north on the bed with her feet somewhat apart.  A large pillow was partially covering the top of her head across the end of the bed.  Another pillow looked as if it were pushed against the head.  The head was laying face down, face turned slightly to the left side.  It -- I pushed the pillow up so I could see her face. I could see a small amount of discharge coming from her mouth and nose.'  The victim was subsequently identified as

---

[2]Respondent admits that the petition is timely and that Petitioner has exhausted his state remedies.  See Resp't Answer at 2.

[3]The Board derived the facts from a 1981 Probation Report.  See Transcript at 23.

|   |   |
|---|---|
| 1 | Deborah Cox.  At approximately 10:40, Stevin Faith made contact with officers in front of the residence.  He provided them with, at that point, the same story he had given Miss Expolious earlier in the morning, [and] further asked if fingerprints could be removed from the body.  The investigating officer told him that was impossible.  Faith then stated he had touched her and his fingerprints would be on the body.  In an autopsy, in the medical examiner's opinion, her death had been caused by asphyxiation associated with findings of manual strangulation.  It had also been discovered during the investigation that the victim appeared to be have been sodomized prior to her death, but she had not apparently engaged in any vaginal or oral intercourse.  Semen with the same blood type as Mr. Faith's was found on the top of the sheet of the bed and apparently the victim's anus, a hair similar to his was found on the blanket.  Mr. Faith was placed under arrest for investigation of murder, December 16th. |

See Transcript at 18-23.

The Board also read into the record, Petitioner's version of the facts as documented in Petitioner's 1981 Probation Report:

> At approximately 7:00 p.m., December 12th, he and his wife and child went to Noble's Bar.  He reported that they remained there until about 9:00 p.m., playing pool, drinking.  He indicated that he consumed a quantity of beer, and his wife drank cokes.  He reports that a disagreement arose between Debbie Cox and Julie.  The former accusing her of taking her coat and that Mr. Faith took Julie home, returning to the bar.  He stated that the same time between 10:30 and 11:00 p.m., the tavern was getting ready to close.  He finished up a beer . . . he was consuming[,] purchased another six pack and left.  After driving around, he arrived at The Buttes, which is apparently another bar, where he began dancing with, among others, Debbie Cox, who was intoxicated.  He advised that she asked him if he wanted to sleep with her.  After some discussion, he agreed.  He claims that he went outside, warmed up his car, then pulled up in front of the tavern, went inside to assist her out to the vehicle.  They drove away, engaging in discussion as to where they could go.  Miss Faith stated that she recalled that Debbie Expolious had asked him if his wife -- him and his wife to watch her home, so they went over there.  After arrival, Mr. Faith gained entry to the home through a bedroom window and let the victim in the front door.  Both went to the bedroom and undressed, the victim telling him that she was on her period.  Further discussion led to her suggesting that they engage in anal intercourse, which was accomplished.  According to Mr. Faith, when they finished, she was still breathing, and he thought that she had passed out.  He reports that after -- after he had asked if she wanted to go home but received no response, then went to his own residence after covering her up.

See Transcript at 23-28.

Additionally, the Board read a 2003 statement made by Petitioner to counselors where Petitioner maintained the consensual nature of the sexual activity, admitted to being intoxicated, and further described the parties subsequent physical struggle as follows:

> Shortly thereafter, Debbie started a conversation wherein she expressed that I was to pay her for having sex with her and for her clothes.  I said I would pay for her clothes but not for having sex with her.  The argument began and Debbie making several threats to tell my wife and [have] me beat up.  I stated she had not made that clear

> beforehand, she wanted money for sex and therefore wasn't getting any. I had no money at the time anyway. When I began getting up, she grabbed my hair and would not let go. I warned her several times to let go, but she insisted that I pay her. After repeated warnings to let go, I grabbed her throat and tried to choke her until she let go. However, when I noticed she was holding my hair tighter, I let go of her throat and tried to strike her face, hitting her in the throat. This was enough to make her let go. I got up and put my shoes -- put on my shoes, winter coat, and left. She appeared to be alive and moving about. I assum[ed] she heard me and would recover momentarily. I left and returned home.

See Transcript at 27-28.[4]

Petitioner did not discuss the commitment offense during the hearing. See Transcript at 28.

The Board's Decision

The Board determined that Petitioner posed an unreasonable risk to public safety for a number of reasons, including: (1) the commitment offense was carried out in an especially cruel and very callous disregard for human suffering as evidenced by the victim's cause of death: asphyxiation associated with manual strangulation; (2) the Petitioner's prior juvenile record of violence including his 1974 armed robbery and attack of a sixty-three-year-old woman; (3) his failure to complete substance abuse treatment; (4) Petitioner's 2003 serious instance of misconduct (a "CDC 115") for mutual combat, and; (5) insufficient anger management training. See Transcript at 130-134.

## DISCUSSION

**I.   Jurisdiction**

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. Petitioner is currently incarcerated at the California Substance Abuse Treatment Facility in Corcoran, which is located in Kings County. As Kings County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus. See 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of

---

[4] On direct appeal of Petitioner's conviction, the California Court of Appeals provided the following brief summary of facts. "In December 1980, defendant met Debbie Cox, the victim, in a bar. He took her to a house that he knew was unoccupied, engaged in sexual activity with her, and strangled her." People v. Faith, No. C053653, 2009 WL 105690 at *1 (Cal. Ct. App. Jan. 16, 2009).

1  habeas corpus to the district court where the petitioner is currently in custody or the district court in
2  which a State court convicted and sentenced Petitioner if the State "contains two or more Federal
3  judicial districts").

**II.     AEDPA Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions. See Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward, 603 F.3d at 555. As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Id. at 72

(quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue. . . . This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003). If the dispositive state court order, however, does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) overruled on other grounds, Lockyer, 538 U.S. at 75-76; see also Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Here, the Superior Court reached a decision on the merits and concluded that some evidence existed to support the Governor's decision. The Superior Court, however, did not provide reasoning to support its conclusion. The California Court of Appeal and the California Supreme Court also denied Petitioner's habeas petition without analysis. Accordingly, the Court will conduct an independent review of the record to ascertain whether the state court's denial was contrary to or involved an unreasonable application of Supreme Court precedent. See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) (finding that where the court has "no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context," an independent review of the record is required to ascertain whether the state court decision was objectively unreasonable).

### III.    Review of Petitioner's Claims

Petitioner contends his due process rights were violated by the Board's denial of parole because the denial was not based on "some evidence" of current dangerousness. Specifically, Petitioner contends the Board improperly relied on his twenty-seven-year-old commitment offense

given the temporal remoteness of the crime, the absence of aggravating circumstances, and that the crime was not committed in an especially cruel and callous manner. See Petition at 32-36, 43-46. Additionally, Petitioner contends that the Board's reliance on Petitioner's 1974 juvenile conviction for the armed robbery of a sixty-three-year-old woman and other lesser crimes committed while Petitioner was still a juvenile were "irrelevant to any reasoned assessment of . . . [Petitioner's] current dangerousness. See Petition at 47-48. Petitioner also contends the Board improperly considered facts derived from a 1981 presentence report prepared for Petitioner's first trial which stated the "victim appeared to have been sodomized." See Petition at 37. Petitioner argues that the Board's recitation of facts failed to take into account that in 2006, the trial court later revised this statement to read "the victim appeared to have engaged in anal sex." See Petition at 37. Finally, Petitioner contends that the Board's consideration of Petitioner disciplinary record including his prior 2003 CDC 115 disciplinary infraction for mutual combat provided "no evidence in support of the Board's decision." See Petition at 50.

The Court analyzes Petitioner's due process claims in two steps:"the first asks whether there exist[s] a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Sass, 461 F.3d at 1127. The United States Constitution does not, by itself, create a protected liberty interest in a parole date. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). The Ninth Circuit Court of Appeals has recognized that "[i]f there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." Hayward, 603 F.3d at 555. The Ninth Circuit further recognized that "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole." Id. at 559. The Hayward court's finding, that there exists no free standing federal due process right to parole or the federal right to some evidence of current dangerousness, contained the consistent and continual caveat that state law may in fact give rise to federal protection for those rights. As the Ninth Circuit later reiterated, "state created rights may give rise to liberty interests that may be enforced as a matter of federal law." Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam) (citing Wilkinson v. Austin, 545 U.S. 209, 221,

(2005)).  The Pearson court found that, " Hayward necessarily held that compliance with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is long-established." Id.

The next question is whether California's parole scheme gives rise to a liberty interest enforced as a matter of federal law.  The Ninth Circuit has definitively concluded that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness." Id. at 611 (citing Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state").  Consequently, the inquiry that a federal habeas court must undertake in determining whether the denial of parole comports with the requirement of federal due process is "whether the California judicial decision approving the parole board's [or governor's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted).

The key inquiry is whether some evidence supports the conclusion that the prisoner currently poses an unreasonable risk of danger to society.  See In re Lawrence, 44 Cal.4th 1181, 1210, 1227 (2008); In re Roderick, 154 Cal.App.4th 242, 263 (2007); In re Lee, 143 Cal.App.4th 1400, 1408 (2006); see also Cooke, 606 F.3d 1206 at 1214.  There is "some evidence" to support a finding if there is at least "a modicum" of evidence.  Lawrence, 44 Cal.4th at 1226.  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" Sass, 461 F.3d at 1129 (quoting Superintendent, Mass. Corr. Inst. at Walpole v. Hill, 472 U.S. 445, 457, (1984)).  There also must be a nexus between the factors that are cited by the the California Board of Parole Hearings ("BPH") or the Governor and the determination of current dangerousness.  See Lawrence, 44 Cal.4th at 1210; In re Rico, 171 Cal.App.4th 659, 686 (2009); In re Palermo, 171 Cal.App.4th 1096, 1107 (2009).  The denial of parole will not be upheld where the BPH "attaches significance to evidence that forewarns

no danger to the public or relies on an unsupported conclusion." In re Tripp, 150 Cal.App.4th 306, 313 (2007).

With respect to the commitment offense, the California Supreme Court has explained:

> [T]he Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance only if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety. Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor.

Lawrence, 44 Cal.4th at 1221. The nature of the commitment offense may combine with other factors, such as post-incarceration history or current mental state and demeanor, to support a finding of unreasonable dangerousness. Id. at 1214; see also Hayward, 603 F.3d at 562. Depending upon the circumstances, factors such as the passage of time and the prisoner's age may make continued reliance on unchanging factors like the nature of the commitment offense unreasonable. See Lawrence, 44 Cal.4th at 1218-19; Roderick, 154 Cal.App.4th at 77; Lee, 143 Cal.App.4th at 1412; In re Elkins, 144 Cal.App.4th 475, 498-500 (2006). "In sum, a reviewing court must consider 'whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke, 606 F.3d at 1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560). Under California law, with respect to an eligible "life prisoner," the BPH "must 'normally set a parole release date' before the minimum term has been served," but "an inmate shall be found unsuitable for parole and denied parole if, in the judgment of the [BPH], the prisoner will pose an unreasonable risk of danger to society if released from prison." In re Dannenberg, 34 Cal.4th 1061, 1078, 1080 (2005) (quoting 15 C.C.R. § 2402(a)); see also Lawrence, 44 Cal.4th at 1204. The BPH determines whether a prisoner is presently too dangerous to be released on parole by examining criteria set forth in regulations. See 15 C.C.R. § 2402; Irons, 505 F.3d at 851-52; Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003).

Title 15, section 2402 of the California Code of Regulations sets forth the factors to be considered by the BPH in applying California's parole statute to Petitioner. Section 2402 lists several circumstances relating to unsuitability for parole, including the nature of the commitment

offense and whether the prisoner has engaged in serious misconduct while incarcerated. Cal.Code. Regs. Tit 15, § 2402(c). Section 2402 also lists factors relating to suitability for parole, such as an inmate's rehabilitative efforts, demonstration of remorse, and lack of a juvenile criminal record. Cal.Code. Regs. Tit 15, § 2402(d).

In finding Petitioner posed an unreasonable risk of danger to society if released, the Board relied on the circumstances of the commitment offense, Petitioner's prior juvenile offense (an armed robbery of a sixty-three-year-old woman), Petitioner's failure to participate in substance abuse treatment, and his recent disciplinary violation (a CDC 115 for mutual combat) and related limited participation in anger management courses.[5] See Transcript at 130-134. The Court examines each factor for evidence of Petitioner's current dangerousness.

### A.   Commitment Offense and Prior Juvenile History

Petitioner challenges the Board's reliance on his commitment offense and his prior juvenile history as "irrelevant" to an assessment of Petitioner's current dangerousness. See Petition at 32-33, 48.

Both the Ninth Circuit and the California Supreme Court have suggested that at some point, relying solely on a prisoner's commitment offense to deny parole may constitute a denial of due process. See e.g., Biggs, 334 F.3d at 916-917 ("continued reliance ... on ... the circumstance of the offense and conduct prior to imprisonment . . . could result in a due process violation"); Lawrence, 44 Cal.4th at 1202 (where evidence of inmate's rehabilitation and suitability for parole is overwhelming, and commitment offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide "some evidence").

---

[5] As noted above, Petitioner additionally contends the Board's recitation of facts was erroneously based on a 1981 sentence report prepared for Petitioner's first trial which stated that the "victim appeared to have been sodomized." See Transcript at 130. As Petitioner points out, it appears the statement was later modified by the trial court at sentencing following Petitioner's second trial. See Petition, Exhibit D at 157. However, at hearing, in response to Petitioner's Counsel objection to the use of the earlier report and statement, the Board's Presiding Commissioner indicated it had acknowledged the error in stating: "I understand your point, and that's well taken." See Transcript at 108-109. Additionally, as we discuss below, the Board's decision was clearly supported by other factors including Petitioner's failure to participate in any substance abuse program and remain disciplinary free. In light of these considerations, the Court finds the Board's use of the 1981 sentence report of no consequence.

However, the Board's determination was not based on Petitioner's commitment offense and prior criminal history alone. Accordingly, the Court need not grapple with the difficult question of whether Petitioner's twenty-seven-year-old commitment offense and even more attenuated juvenile record by themselves constitute "some evidence" of an unreasonable risk of danger, as the Board's determination was based in part on Petitioner's failure to complete any form of substance abuse treatment and disciplinary record while incarcerated. See Sass, 461 F.3d at 1128 ("relevant question is whether there is any evidence in the record that could support the conclusion reached") (emphasis added); see also Biggs, 334 at 916 (despite the fact that several of the Board's reasons for denying parole were not supported by the record, some evidence as to one of the Board's reasons was sufficient to preclude habeas relief).

**B.      Failure to Complete Substance Abuse Treatment**

The Board found that Petitioner's failure to complete any form of treatment for his substance abuse weighed against finding Petitioner suitable for parole. The Board stated:

> We do not see any effort on your part to do any self-help groups such as AA. . . . We don't see a great deal of effort on your part to avail yourself of that. There are also faith-based Alcoholics Anonymous type 12 step . . . programs that might do you well in terms of dealing with the reliance that you had at the time on alcohol.

See Transcript at 132. Later the Board concluded its remarks by directing Petitioner to seek "self-help that goes directly to [his] alcohol dependence . . . ." See Transcript at 134. In contrast, a 2004 Psychologist Report, prepared for an earlier Parole Board hearing stated: "[i]n this writer's opinion, the potential for reversion to alcohol use in the future is essentially nil in this case." See Resp't Answer Exhibit 1, part 3 at 140. The report also stated: "[c]ertainly, alcohol use was a significant cause of the commitment offense. However, in the last 24 years, there was no indication that inmate Faith has ever used alcohol. He does not qualify for a current diagnosis of alcohol abuse." See Resp't Answer Exhibit 1, part 3 at 140.

In light of Petitioner's twenty-six years of institutional remission and favorable Psychologist Report, the nexus between his failure to complete substance abuse treatment and his current dangerousness is tenuous. Nevertheless, given Petitioner's admitted use of alcohol during virtually every one of his prior incidents of criminal conduct, we find the nexus sufficient to satisfy the "some evidence" standard.

As noted above, Petitioner discussed events leading up to his commitment offense in his 2003 statement to counselors, and stated that both he and his victim were intoxicated. See Transcript at 26. In addition, the August 29, 2006 Probation Officer's Report submitted to the trial court at sentencing indicated that "[i]t appears the defendant has some history of alcohol abuse and it appears defendant was consuming alcohol the night of the instant offense." See Petition, Exhibit D, at 155. Additionally at hearing, Petitioner discussed a 1973 incident where he stole two shotguns from his grandparents home in Gridley.  Commenting on this incident at the hearing, Petitioner admitted that he and other youths, "went to Sacramento, got extremely intoxicated, and then headed north" to Gridley where he proceeded to steal the weapons. See Transcript at 45.  Finally, in discussing his 1974 juvenile conviction for robbery, Petitioner stated that he walked behind the victim and "grabbed [the woman] with [his] nunchakus." See Transcript at 38.  When asked by the Board whether he had placed the nunchakus around the victim's throat, Petitioner stated:  "I think so.  I'm not sure.  I was pretty loaded.  I was drinking with the rest of them." See Transcript at 39.

Petitioner's admitted substance abuse coupled with his lackadaisical attitude towards participation in any substance abuse program evidence his potential for relapse which would place him at a greater risk of reoffense.  In light of the role alcohol played in Petitioner's commitment offense and past criminal conduct, we find the Board's concerns well justified as Petitioner's failure to complete substance abuse treatment is probative of his current dangerousness.

**C.    Disciplinary Record Post-Incarceration**

Petitioner challenges the Board's reliance on his disciplinary history.  During the hearing, the Board reviewed Petitioner's disciplinary record for the period of his confinement and found that he had received five CDC 115 serious violations and ten CDC 128 minor violations.  See Transcript at 59.  A CDC 115 documents misconduct believed to be a violation of law or otherwise not minor in nature.  See Cal.Code Regs., tit. 15, § 3312(a)(3); In re Gray,151 Cal.App.4th at 389, 59 Cal.Rptr.3d 724.  A CDC 128 documents incidents of minor misconduct.  See Cal . Code Regs., tit. 15, § 3312 (a)(2). The record reflects the Board appeared to discount the 115's occurring prior to 2001, as these violations occurred decades earlier and according to Petitioner, some of the earlier 115's (those occurring in the 1980's), had been reduced to 128's. See Transcript at 62-63.  In its final decision, the

U.S. District Court
E. D. California

13

Board focused its concerns on Petitioner's fifth and most recent CDC 115 occurring in 2003. See Transcript at 132,134.

Section 2402 expressly provides that a prisoner's serious misconduct in prison is a factor that tends to show unsuitability for parole. Cal.Code. Regs. Tit 15, § 2402(c)(6). Petitioner received his most recent CDC 115 on February 21, 2003, for the assault of another prisoner during mutual combat. Though Petitioner contends the other prisoner initiated the attack, the incident occurred after Petitioner was urged to remain discipline free at a previous (October 2, 2001) parole hearing. See Transcript at 54. In rendering its decision, the Board commented on Petitioner 2003 CDC 115, and stated that "while incarcerated" Petitioner had "failed to demonstrate evidence of any positive change" and recommended that he "remain disciplinary free" in the future. See Transcript at 132, 134. The Court finds it was reasonable for the board to consider Petitioner's recent 115 as evidence of current dangerousness because there is a reasonable likelihood that an inmate who cannot adhere to the rules and laws inside of prison will not be able to adhere to the laws outside of prison.

## CONCLUSION

As the Board did not rely solely on the commitment offense and pre-incarceration record, Petitioner cannot claim that his due process rights were violated by reliance on immutable factors. Lawrence, 44 Cal.4th at 1191 (finding that even where the commitment offense was particularly egregious, reliance on this immutable factor may violate a petitioner's due process rights). Rather, the Court finds those two immutable factors, when combined with current factors (both Petitioner's failure to seek substance abuse training and recent CDC 115), provided a nexus for finding that Petitioner posed a current risk of danger. Consequently, the Superior Court's decision affirming the Board's denial of parole was not an unreasonable application of California's "some evidence" standard and Petitioner is not entitled to habeas corpus.

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may issue a certificate of appealability where "the applicant has made a substantial showing of the

denial of a constitutional right." Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 326; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his ... part." Miller-El, 537 U.S. at 338.  In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus Petitioner's claim is not deserving of encouragement to proceed further.  Consequently, the Court hereby recommends that Petitioner be DENIED a certificate of appealability.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that:

(1) The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

(2) the Clerk of Court be DIRECTED to enter judgment for Respondent; and

(3) A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after date of service of this order, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) court days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   December 15, 2010            /s/ John M. Dixon**
UNITED STATES MAGISTRATE JUDGE